IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Regions Bank d/b/a Regions Mortgage, | ) ) ) | Civil Action No.: 4:13-cv-195-RBH |
| Plaintiff, | ) ) ) | **ORDER** |
| v. | ) ) | |
| Stewart Title Guaranty Company and Ginn Title Services, LLC, | ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiff Regions Bank d/b/a Regions Mortgage ("Regions" or "Plaintiff") filed this action against Defendants Stewart Title Guaranty Company ("Stewart" or "Defendant") and Ginn Title Services, LLC ("Ginn") on March 6, 2013. *See* Compl., ECF No. 1. Plaintiff asserts claims against Stewart for (1) breach of contract and (2) declaratory relief. *See id.* at 7–10. Plaintiff asserts claims against Ginn for (1) breach of contract, (2) negligence, and (3) breach of fiduciary duty.[1] *See id.* at 10–12.

This matter is before the Court on the cross motions for summary judgment filed by Regions and Stewart on April 18, 2014. *See* Def.'s Mot., ECF No. 49; Pl.'s Mot., ECF No. 50. Both parties timely filed responses in opposition to the corresponding motions for summary judgment on May 9,

---

[1] On February 21, 2013 Ginn answered the complaint. *See* Answer of Ginn, ECF No. 9. On January 16, 2014, however, counsel for Ginn moved to withdraw. *See* Mot., ECF No. 34–35. The Court granted this motion and instructed Ginn that it must obtain counsel by February 17, 2014, and that failure to do so could result in its answer being stricken and entry of default on the Court's docket. *See* Order, ECF No. 37. As of February 21, 2014, no counsel had appeared on behalf of Ginn. Therefore, the Court set a status conference for March 7, 2014. *See* Notice of Hearing, ECF No. 44. The Court notified the representative of Ginn of this status conference, however no representative appeared on behalf of Ginn. *See id.* Accordingly, the Court ordered that Ginn's answer be struck and the Clerk to enter default as to Ginn. *See id.* The Clerk entered default as to Ginn on that same day, March 7, 2014. *See* Clerk's Entry of Default, ECF No. 47.

2014. *See* Def.'s Resp., ECF No. 54; Pl.'s Resp., ECF No. 55.    The parties also both filed replies in support of their motions on May 16, 2014.    *See* Def.'s Reply, ECF No. 57; Pl.'s Reply, ECF No. 58. A hearing was held before the undersigned on December 22, 2014.    For the reasons stated below, the Court grants Defendant Stewart Title's motion and denies Plaintiff's motion.

## FACTUAL BACKGROUND

In early 2007, SWWM, Ltd. ("SWWM"), a Pennsylvania limited partnership, submitted a loan application to Regions to purchase property located at 7604 Cabana Court, Unit 402, Reunion, Florida 34747 (the "Florida property") for $675,900.    *See* Complaint, ECF No. 1 at ¶¶ 6, 8; Loan Application of SWWM, ECF No. 50-2 at 2–11.    In connection with the anticipated Mortgage, Regions obtained a title insurance commitment from Stewart for the full amount of the loan proceeds. *See* Title Insurance Commitment, ECF No. 1-1.    Stewart, through its authorized title agent, Ginn Title Services, LLC, also issued a Closing Protection Letter ("CPL") on March 9, 2007.    *See* Closing Protection Letter, ECF No. 49-2.

Regions then performed an underwriting review, and on March 16, 2007 completed its administrative desk review appraisal of the Florida property.    *See* Appraisal, ECF No. 49-5. Regions' appraiser disagreed with the field evaluator's value estimate of the Florida property.    *See id.*    Accordingly, SWWM offered to provide additional property located at 2180 Waterview Drive, Unit #712, North Myrtle Beach, South Carolina 29582 (the "South Carolina property") as additional collateral for Regions to consider in underwriting the loan.    *See* Aff. of Steven Purser, ECF No. 50-1 at ¶ 8.    Regions approved the loan based on the expectation that it would be secured by security interests in both the Florida property and the South Carolina property.    *See* Aff. of Steven Purser, ECF No. 50-1 at ¶ 9.

2

The South Carolina property was owned by the individual members of SWWM. *See* Loan Application of John Molitoris, ECF No. 49-3 at 4–5; Ginn's Responses to Requests for Admissions, ECF No. 50-5 at 4. Prior to the closing, Ginn had a preliminary opinion of title confirming that the South Carolina property was owned by and title vested in the individual names of Jay H. Swartz, William E. James, John Molitoris, and Wayde A. Walter. *See* ECF No. 50-5 at 4. These individuals were the individual partners of SWWM. *See id.* The South Carolina property was not owned or titled in the name of SWWM.

The closing occurred on March 28, 2007, with Ginn serving as closing agent. *See* ECF No. 1 at ¶ 23. Regions provided Ginn with both general and specific written closing instructions, *see* Closing Instructions, ECF Nos. 1-2 and 1-3, and Ginn agreed to comply with Regions' closing instructions, *see* ECF No. 50-5 at 3. Regions also prepared the loan documents and gave them to Ginn for execution. *See* ECF No. 1 at ¶ 17. The general closing instructions provided that: "[t]he names on the security instrument must exactly match the names on the title and all required parties must execute all related documents in order to obtain a valid lien for Regions Bank d/b/a Regions Mortgage." General Closing Instructions, ECF No. 1-3 at 7. The general closing instructions also required Ginn Title to ensure the loan was "closed in a timely and correct manner," and to contact Regions in the event the forms provided by Regions contained any "obviously incorrect" information and to pay "special attention . . . to the name(s) of the borrower(s) as designated in the loan closing instructions." *Id.* at 2, 7. The specific closing instructions further provided that the mortgages should be executed as drafted and that all documents must be executed in the name of SWWM. *See* Specific Closing Instructions, ECF No. 1-2 at 2–3.

3

The mortgages were executed at the closing, and the South Carolina mortgage was properly recorded in Horry County. *See* Mortgage for South Carolina Property, ECF No. 1-7. A mortgage on the South Carolina property was executed by John Molitoris on behalf of SWWM in his capacity as a general partner. *See id.* at 14. However, again as noted above, the South Carolina property was still titled in the name of the individual members of SWWM and not in the name of SWWM. By February 2009, the loan was in arrears. *See* Foreclosure Complaint, ECF No. 50-3 at 17–23. Accordingly, Regions turned the matter over to its Florida foreclosure attorneys.

On August 4, 2009, Regions' account log shows Regions was informed via a telephone conversation with one of SWWM's partners that the South Carolina property had been sold. *See* Consolidated Log Notes, ECF No. 49-6 at 4. A separate account note on that date details an outgoing email from Regions Mortgage, which stated that the borrower claimed the South Carolina property "was sold via a short sale and the funds were received by the 1st lien holder." *Id.* at 5. Two days later, Regions' foreclosure counsel in Florida confirmed the same to Regions, noting that: "[i]n reviewing the mortgage and performing some preliminary searches on the Horry County web-site we have found that [the South Carolina property] . . . was never owned by SWWM, Ltd., the borrower listed on the mortgage." *Id.* at 3. A memo from the Florida foreclosure attorney to Don Wallace at Regions Mortgage followed on January 22, 2010, which stated that, from reviewing "on-line county and state records" counsel determined that "SWWM signed the mortgage with Regions" on the South Carolina property but that SWWM "never actually owned" the South Carolina property. *See* Mayerson Memo, ECF No. 49-14.

Regions then sought a formal title abstract from a South Carolina attorney, Jay Anderson. *See* Title Abstract, ECF No. 55-7. Attorney Anderson emailed his official opinion to Regions'

4

Florida counsel on March 3, 2010, confirming that the South Carolina property was in fact never owned by SWWM, and therefore Regions did not have an enforceable lien on the property. *See* Purser Aff., ECF No. 50-1 at ¶ 17; Email, ECF No. 50-3 at 66.

As a result, Regions submitted a claim for indemnity under the Closing Protection Letter ("CPL") to Stewart on May 7, 2010, which Stewart received on May 10, 2010. *See* Notice Letter, ECF No. 49-7.[2] This claim was denied on May 17, 2010, and Stewart's basis for denial was that a separate title policy was not issued on the South Carolina property, asserting that unless title

---

[2] This letter stated in relevant part as follows:

> RE: Title Claim filed on Closing Protection Letter Dated 3/9/2007
> . . .
> Property Address:     (Additional collateral – 2180 Waterview Dr. #721, N Myrtle Beach, SC 29582)
> . . .
> Regions Bank d/b/a Regions Mortgage is the insured claimant under the above referenced Closing Protection Letter.
>
> The account is currently in foreclosure and a title report indicates the following as exceptions to the title:
>
> > (1) As per our closing instructions dated March 27, 2007, the settlement agent, Ginn Title Services, LLC was to guarantee a 1st lien position on the above property. The title to the property prior to closing was in the name of Jay H. Swartz, William E. James, John Molitoris and Wayde A. Walter and a deed should have been conveyed to SWWM, Ltd for Regions to have a valid first lien. Since this closing the property has been conveyed to another individual and it is secured by a mortgage.
>
> . . .
> Please consider this as notice by an insured claimant under the Closing Protection Letter.
> . . .
> I request you protect the interest of Regions Bank in this matter. Please advise me how you intend to proceed with this claim.

*See* ECF No. 50-3 at 74–5.

insurance was required on the additional South Carolina collateral, it is not covered by the CPL.  *See*

Denial of Claim, ECF No. 50-3 at 77.[3]   There was no dispute that the title insurance policy that was

issued covered the Florida property, and that no title insurance policy was issued covering the South

Carolina property.   This lawsuit followed.

The relevant portions of the CPL at issue in this case are as follows:

> 24010568
> Regions Bank d/b/a Regions Mortgage
> Its successors and/or assigns as their interest
> may appear
> P O Box 18001
> Hattiesburg, MS 39404-800
>
> Re Insured Closing Service
>     Buyer/Borrower SWWM, LTD
>
> Property Address:
> 7604 Cabana Court Unit 402
> Reunion, FL 34747
>
> 091368
> Ginn Title Services, LLC
> 901 North Olive Avenue
> W. Palm Beach, FL 33401
>
> Dear Madam or Sir:
>
>     When title insurance of Stewart Title Guaranty Company is
> specified for your protection in connection with closings of real estate
> transactions in which you are to be the lessee or purchaser of an interest
> in land or a lender secured by a mortgage (including any other security

---

[3] After Regions' filed its claim under the CPL, Melanie R. McDonald, Claims Coordinator for Stewart Title emailed Regions' representative, Paula Jackson, on May 17, 2010.   In this email, she asked: "Do you have a commitment and/or policy that references the Myrtle Beach property?"  *See* Email Exchange, ECF No. 50-3 at 78.   Later that same day, Ms. Jackson, Legal Assistant for Regions Mortgage responded to Ms. McDonald: "No.   Title insurance was not required on the additional collateral at that time."   *See id.* at 77.   Ms. McDonald then replied that: "If title insurance was not required on the additional collateral this matter is not covered."   *Id.*

instrument) of an interest in land, the Stewart Title Guaranty Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by said issuing agent or Approved Attorney when such loss arises out of

1. Failure of said Issuing Agent or Approved Attorney to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or lien, or (b) the obtaining of any other document, specifically required by you, but not to the extent that said instructions require a determination of the validity, enforceability or effectiveness of such other documents, or (c) the collection and payment of funds due you, or

. . .

CONDITIONS AND EXCLUSIONS

. . .

D. Claims of loss shall be made promptly to the Stewart Title Guaranty Company at its principle office at P O Box 2029, Houston, Texas 77252. When the failure to give prompt notice shall prejudice the Stewart Title Guaranty Company, then liability of the Stewart Title Guaranty Company hereafter shall be reduced to the extent of such prejudice. The Stewart Title Guaranty Company shall not be liable hereunder unless notice of loss in writing is received by the Stewart Title Guaranty Company within ninety (90) days from the date of discovery of such loss.

*See* ECF No. 49-2 at 2–3.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of proving that summary judgment is

7

appropriate. Once the moving party makes the showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

When no genuine issue of any material fact exists, summary judgment is appropriate. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Id.* However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In this case, the moving party "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick Cnty. Comm'rs*, 845 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the moving party carries this burden, "the burden then shifts to the non-moving party to come forward with fact sufficient to create a triable issue of fact." *Id.* at 718–19 (citing *Anderson*, 477 U.S. at 247–48).

Moreover, "once the moving party has met its burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). The nonmoving party may not rely on beliefs, conjecture, speculation, of conclusory allegations to defeat a motion for summary judgment. *See id.*; *Doyle v. Sentry, Inc.*, 877 F. Supp. 1002, 1005 (E.D. Va. 1995). Rather, the nonmoving party is required to submit evidence of specific facts by way of affidavits, depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *Baber*, 977 F.2d at 875 (citing *Celotex*, 477 U.S. at 324)). Moreover, the nonmovant's proof must meet "the substantive evidentiary

8

standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993); *DeLeon v. St. Joseph Hosp., Inc.*, 871 F.2d 1229, 1223 n.7 (4th Cir. 1989).

DISCUSSION

## I.     Choice of Law

Before proceeding to the merits of the parties claims, a threshold question is whether Florida law or South Carolina law will govern this case.   Generally a federal court sitting in diversity must apply the conflict of law provisions of the forum state.   *Thornton v. Cessna Aircraft Co.*, 886 F.2d 85, 87 (4th Cir. 1989) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).   "In contract actions, South Carolina courts apply the substantive law of the place where the contract at issue was formed . . . where a contract's formation, interpretation, or validity is at issue."   *Witt v. Am. Trucking Assocs., Inc.*, 860 F. Supp. 295, 300 (D.S.C. 1994).   Here, there is no dispute that the CPL was issued in Florida pursuant to Florida's regulatory requirements.   Moreover, the parties seek to have this Court interpret the terms of the CPL.   Accordingly, under South Carolina's conflict of law provisions, Florida law will apply in this case.

## II.     Closing Protection Letters and their Relationship with Title Insurance

The instrument at the center of the dispute in this case is a "Closing Protection Letter."   CPLs are indemnification contracts under Florida law.   *See* Order, *F.D.I.C. v. Property Transfer Servs.*, No. 12-cv-80533, at 10 (S.D. Fla. May 15, 2013); *see also* ECF No. 49-2 (discussing the scope of coverage).   A CPL is separate and distinct from title insurance.   As one leading treatise explains, CPLs are "considered to be issued 'incidentally' to title insurance," and title insurers issue the letters as an inducement for customers to purchase their company's title policies.   Joyce D. Palomar, *Title Insurance Law* § 20:19 (2014–15 ed.).   In other words, CPLs are designed to persuade customers to

9

trust the agents of the title insurer. *Id.* Because consideration is given for the CPL (the lender buying title insurance), "breach of an insurer's promises [in the CPL] supports an action for breach of contract that is independent of any action on the title insurance policy." *Id.* (emphasis added).

A title insurer's obligations under a CPL are *separate* from those under the policy. *Id.* (emphasis added). Although the letter is not a separate insurance contract, an insured may seek recovery under both the CPL and any corresponding title policy, thus "the letter is 'integrated into the title policy.'" Barlow Burke, *Law of Title Insurance* § 13:10 (quoting *Wells Fargo Bank N.A. v. Bank of Am.*, N.A., No. 11 Civ. 4062(JPO), 2013 WL 372149, at *6 (S.D.N.Y. Jan. 31, 2013)). However, the CPL provides "additional protection not provided, or perhaps even excluded, by the policy." *Id.*

CPLs are designed to allow a lender to rely on the fact that "it will be reimbursed for the misconduct of the title insurance underwriter's agent during the closing." *F.D.I.C. v. Prop. Transfer Servs., Inc.*, No. 12-80533-CV, 2013 WL 5535561, at *4 (S.D. Fla. Oct. 7, 2013). CPLs are intended, therefore, to make underwriters "contractually responsible for loss caused by their agent's misconduct at closing." *JP Morgan Chase Bank, N.A. v. First Am. Title Ins. Co.*, 795 F. Supp. 2d 624, 629 (E.D. Mich. 2011) (citing *Bergin Fin., Inc. v. First Am. Title Co.*, 397 Fed. App'x 119, 125 (6th Cir. 2010)). As a result, the CPL is the means by which a title insurer "quell[s] a lender's understandable fear of entrusting an unknown agent with large sums of money and important legal documents." *F.D.I.C. v. Attorneys' Title Ins. Fund*, No. 12-23599-CV, 2014 WL 4384270, at *4 (S.D. Fla. Sept. 3, 2014).

In sum, title insurance protects against defects in title, while a CPL protects against the closing agent's fraud, dishonesty, or failure to follow instructions. *Id.* These instruments cover different

10

risks and serve different purposes, and thus it is "clear that the CPL and title insurance policy are distinct." *Id.*

### III.    Analysis of the CPL's Terms

#### 1.  Introduction and Terms of the CPL

Having detailed what a CPL is in general, the Court turns to the CPL at issue in this particular case.   Florida requires that all title insurers utilize a form CPL for use in conjunction with Florida real estate transactions.   *See* Fla. Stat. Ann. § 627.786; Fla. Admin. Code § 69O-186.010.   The language of the CPL at issue in this case tracks the language provided for in the Florida Administrative Code. In relevant part, the CPL states that:

> When title insurance of Stewart Title Guaranty Company is specified for your protection in connection with closings of real estate transactions in which you are to be the lessee or purchaser of an interest in land or a lender secured by a mortgage (including any other security instrument) of an interest in land, the Stewart Title Guaranty Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by said issuing agent or Approved Attorney when such loss arises out of
>
> > 1.  Failure of said Issuing Agent or Approved Attorney to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or lien, or (b) the obtaining of any other document, specifically required by you, but not to the extent that said instructions require a determination of the validity, enforceability or effectiveness of such other documents, or (c) the collection and payment of funds due you, or
> >
> > 2.  Fraud or dishonesty of said Issuing Agent or Approved Attorney in handling your funds or documents in

11

connection with such closing.

*See* ECF No. 49-2 at 2; *see also* Fla. Admin. Code § 69O-186.010.  The parties agree that the relevant question is whether Stewart must indemnify Regions for Ginn's failure to follow Regions' closing instructions.

### 2.  Florida Rules of Contract Interpretation

The interpretation of a written contract of indemnity is ordinarily a matter of law to be determined by the Court.   *DEC Elec., Inc. v. Raphael Constr. Corp.*, 558 So. 2d 427, 428 (Fla. 1990); *see also Gibbs v. Air Canada*, 810 F.2d 1529, 1533 (11th Cir. 1987).   The intent of the parties and the scope of the indemnification provision are derived from the language of the contract and the circumstances in which it was made.   *Improved Benevolent & Protected Order of Elks of the World, Inc. v. Delano*, 308 So. 2d 615, 617 (Fla. Dist. Ct. App. 1975); *see also Gibbs*, 810 F.2d at 1533.   The terms of the indemnity contract determine whether the "indemnitor is obligated to reimburse the indemnitee for a particular claim."   *See Camp, Dresser & McKee, Inc. v. Paul N. Howard Co.*, 853 So. 2d 1072, 1077 (Fla. Dist. Ct. App. 2003).

Under Florida law, "where the language in an insurance contract is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning so as to give effect to the policy as written."   *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013).   Moreover, "[i]f the provisions of a contract are unambiguous, courts may not violate the clear meaning of the words in order to create ambiguity, and certainly may not rewrite the contract."   *Fla. Recycling Servs., Inc. v. Greater Orlando Auto Auction, Inc.*, 898 So. 2d 129, 131 (Fla. Dist. Ct. App. 2005).   "If possible, conflicting provisions of a contract are to be read in such a way as to give a reasonable interpretation and effect to all provisions."   *Discover Prop. & Cas. Ins. Co. v. Beach Cars of W. Palm, Inc.*, 929 So.

2d 729, 733 (Fla. Dist. Ct. App. 2006) (citing *Cont'l Ins. Co. v. Collinsworth*, 898 So.2d 1085, 1087 (Fla. Dist. Ct. App. 2005)).

If a contract is "susceptible to more than one reasonable interpretation" and cannot be reasonably reconciled, the contract is deemed ambiguous and rules of contract interpretation must be applied. *State Farm Mut. Auto. Ins. Co. v. Menendez*, 70 So. 3d 566, 570 (Fla. 2011) (quoting *Travelers Indem. Co. v. PCR Inc.*, 889 So. 2d 779, 785 (Fla. 2004)). But courts cannot rewrite contracts or add meaning to create ambiguity. *Dahl–Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1382 (11th Cir. 1993) (citing *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla. 1986)). Where the terms of a contract are ambiguous, the actual intention of the parties—the governing principle of contract construction—becomes a question of fact. *In re Gardinier, Inc.*, 831 F.2d 974, 976 (11th Cir. 1987); *Menendez*, 70 So. 3d at 570; *Talbott v. First Bank Fla., FSB*, 59 So. 3d 243, 245 (Fla. Dist. Ct. App. 2011) (noting that "[w]hether a contract is ambiguous is a question of law," but that "[w]hen a contract is ambiguous, an issue of fact is created that cannot be resolved by summary judgment"). Finally, only if a provision is ambiguous after considering the policy as a whole will Florida courts construe the ambiguous provision against the insurer in favor of coverage. *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So.2d 161, 165–66 (Fla. 2003) (citations omitted).

### 3. Analysis of Scope of Indemnity Coverage

The first issue that the parties argue is whether, under the terms of the CPL, the South Carolina property is covered. Their primary dispute is over whether the plain language of the CPL requires that a title insurance policy be issued on a specific piece of property for which coverage is sought, or merely that some title insurance policy be issued in conjunction with some portion of the transaction,

13

for coverage to exist.  The parties also dispute whether there is any significance in the referencing only of the Florida property at the top of the CPL, and whether this affects the analysis.

As noted above, purchasing a title insurance policy constitutes the consideration supporting the CPL.  The question for the Court is whether the CPL merely requires that *some* title insurance policy be issued in connection with the overall transaction, or whether the specific property/mortgage transaction for which CPL coverage is sought must also be covered by a title insurance policy.  In other words, does the CPL cover the entirety of the mortgage transaction or just the part of the transaction that was covered by a title insurance policy?  The parties were unable to provide any authority to the Court that directly addresses this issue.

The Court notes that Regions makes a persuasive argument for finding coverage for the South Carolina property.  Under the plain language of the CPL, the only requirement for coverage is that some title insurance policy be issued in conjunction with the transaction.  Here, it is undisputed that Regions purchased a title insurance policy from Stewart for the full $675,000 value of the loan.  It is also undisputed, however, that this title insurance policy was issued prior to SWWM pledging the South Carolina property as additional collateral for the loan.  Nevertheless, the language of the CPL merely states that it applies "[w]hen title insurance of Stewart Title Guaranty Company is specified for your protection in connection with closings of real estate transactions in which you are to be the lessee or purchaser of an interest in land or a lender secured by a mortgage."  *See* ECF No. 49-2 at 2. Accordingly, the plain language requires only that a Stewart Title policy be "specified," as it was here, in connection with any closings in which Regions was to have a mortgage interest.  The Court would have to read in an additional requirement in order to find that a policy of title insurance must cover the specific mortgage transaction at issue.  The CPL does not contain any language suggesting

that it only applies to closings of the specific parcels of the transaction covered by a title insurance policy.   The only express prerequisite is that a policy of title insurance also be issued in connection with the transaction, as it was here.

Stewart argues, however, that the referencing of the address of only the Florida property on the top of the CPL means that it was only intended to apply to that piece of property.   As Regions notes, however, there is considerable doubt as to whether this was even proper under the Florida regulatory scheme.   Looking at the form language specified in the Florida Administrative Code, the only places for an insurer to add additional information beyond the promulgated language were places for (1) the date, (2) the title insurer's letterhead, and (3) "RE: (insert name of issuing agent or approved attorney)."   *See* Fla. Admin. Code § 69O-186.010.   Regions argues that there is some question as to whether the address was properly added in light of this, as the form language does not provide a place to input addresses.   Moreover, the language of the body of the CPL does not refer to this particular address in any way, or indicate that the scope is to be limited or restricted solely to the identified address (*i.e.* the Florida property).   Aside from the referencing of the address at the top of the CPL, there is no indication that the Florida property address was listed with the intent to limit the CPL to that parcel only.   Regions argues that the language of the CPL indicates it was intended to cover the transaction as a whole, rather than any one piece of property.   The CPL language stating "said mortgage on said interest of land" does not refer to the address referenced at the top of the CPL. Rather, that language relates to the preceding paragraph, which notes that the CPL covers "real estate transactions in which you are to be the lessee or purchaser of an interest in land or a lender secured by a mortgage."   *See* ECF No. 49-2 at 2.

Regions makes a persuasive argument that the South Carolina property should be covered by the CPL, however, as discussed more fully below, the notice issue is dispositive of this case and requires judgment in favor of Stewart.

### 4. Notice Provision

The Court finds that the notice provision of the CPL is dispositive of this matter.  The CPL first states that "when failure to give prompt notice shall prejudice Stewart [] liability of Stewart [] hereunder shall be reduced to the extent of such prejudice."  *See* ECF No. 49-2 at 3.  The CPL then sets forth a notice requirement, providing that Stewart shall not be liable "unless notice of loss in writing is received by Stewart Title within ninety (90) days of the discovery of such loss."  *See* CPL, ECF No. 49-2.  These provisions track the exact language of Florida regulation setting forth the standardized language to be used in Florida CPLs.  *See* Fla. Admin. Code § 69O-186.010.

Here, the Court has the benefit of two cases from federal courts in Florida interpreting this exact provision.   In each of these cases, the court determined that "the 90 day notice provision in the CPLs constitutes an absolute bar to liability regardless of prejudice."  Order, *F.D.I.C. v. Property Transfer Servs.*, No. 12-cv-80533, at 10 (S.D. Fla. May 15, 2013); *see also F.D.I.C. v. Attorneys' Title Ins. Fund*, No. 12-23599-CIV, 2014 WL 4384270, at *6 (S.D. Fla. Sept. 3, 2014) ("The 90-day notice requirement is a 'bright line,' meaning that prejudice is irrelevant outside of the 90-day notice period.").[4]  Thus, whether Regions "may pursue it claims depends on when the loss was discovered

---

[4]  At the hearing, counsel for Regions acknowledged that these cases are problematic if the Court were to find them persuasive.  Counsel noted that one of these cases, however, has been appealed and is still pending before the Eleventh Circuit.  *See* Notice of Appeal, *F.D.I.C. v. Property Transfer Servs.*, No. 13-15058 (Nov. 1, 2013).  Moreover, counsel argued that this Court is not bound by a determination of the Southern District of Florida, and urged this Court to reach a different result based

in this matter."   Order, *F.D.I.C. v. Property Transfer Servs.*, No. 12-cv-80533, at 10 (S.D. Fla. May 15, 2013).

Although Regions urges the Court to reach a different conclusion based on the language of the CPL, the Court agrees with these other courts that have interpreted these provisions.   The plain language of the CPL completely absolves Stewart from liability unless notice is received within 90 days of the discovery of the loss.   The prejudice provision comes first, noting that liability will be reduced to the extent of any prejudice caused by failure to give prompt notice of a claim of loss.   *See* ECF No. 49-2 at 3.   The CPL then states that Stewart shall not be liable unless notice is received "within ninety (90) days from the date of discovery of such loss."   *Id.*   The Court agrees with Stewart that the plain language provides for a ninety day window from the date of discovery of a loss, and that any liability of Stewart is reduced to the extent the insured fails to give prompt notice in that window and Stewart suffers prejudice.   However, once the ninety days have passed, Stewart cannot be held liable.

Accordingly, the Court must determine whether notice was timely provided in this case.   If notice was not provided within the 90 day window, then the provision is an "absolute bar to liability regardless of prejudice."   Florida cases interpreting the notice provision have found that "the 'discovery of loss,' must encompass not only the discovery of an actual loss, but also the discovery of facts which give rise to a claim covered by the CPL."   *See* Order, *F.D.I.C. v. Property Transfer Servs.*, No. 12-cv-80533, at 12 (S.D. Fla. May 15, 2013); *see also F.D.I.C. v. Stewart Title Guar. Co.*, No. 12-cv-10062-CV, 2013 WL 1891307, at *6 (S.D. Fla. May 6, 2013) ("[A]n insured must have

on the language of the CPL.  Mindful of this fact, the Court nevertheless finds these opinions persuasive for the reasons stated in this Order.

17

discovered *both* actual loss and the facts giving rise to a potential claim in order to start the 90 day clock for notifying the insurer of the claim under the CPL.").   Moreover, one Florida court has held that "knowledge of specific acts that may give rise to a covered loss together with information indicating that the loans are grossly under-securitized . . . amount to discovery of loss under the CPL." *See* Order, *F.D.I.C. v. Attorneys' Title Ins. Fund, Inc.*, No. 10-21197-CIV, at 9–10 (S.D. Fla. May 17, 2011).   In other words, so long as the lender "had knowledge that the collateral was insufficient to cover the amount of the loans, it 'discovered' an actual loss within the meaning of the CPL."   *Id.* at 11.

The Court finds that Regions failed to provide timely notice as required by the CPL.   Regions argues that it did not have knowledge of an "actual loss" until the foreclosure of the Florida property was completed on November 29, 2010, as that was the date the loss was reduced to a sum certain.   Moreover, Regions asserts that it did not discover the facts giving rise to a potential CPL claim until it received an abstract of title on the South Carolina property from a South Carolina lawyer on March 3, 2010.[5]   Regions asserts that only a licensed attorney is authorized to conduct or supervise examinations of title.   *See State v. Buyers Servs. Co., Inc.*, 357 S.E.2d 15, 18–19 (S.C. 1987); *Ex parte Watson*, 589 S.E.2d 760, 761 (S.C. 2003).   As a result, Regions claims that it did not have an opinion of title which it could rely on by law prior to that date.   Regions asserts that any preliminary search conducted by anyone who is not a South Carolina attorney was insufficient to give Regions knowledge of and discovery of the actual loss.   Thus, Regions argues, the information provided to

---

[5] On March 3, 2010, the South Carolina attorney informed Regions through its Florida foreclosure attorney that "we cannot foreclose on a mortgage which was never actually secured by the property," *see* Email from Jay Anderson to Leah Mayerson, ECF No. 50-3 at 66 (referring to the South Carolina property).

Regions on August 6, 2009 by its Florida foreclosure attorney (which indicated a preliminary search on the South Carolina property revealed it was never owned by SWWM) would not constitute discovery of the loss. A more formal memo from its Florida foreclosure counsel confirmed the problem with the title on January 22, 2010. It is undisputed that Regions provided notice of its claim to Stewart on May 10, 2010. *See* Notice Letter, ECF No. 49-7. This date would be within 90 days of March 3, 2010.

As Stewart correctly argues, however, Regions contention regarding the actual loss has been rejected by Florida courts interpreting the notice provision. In *Attorneys' Title*, the Florida district court soundly rejected the very same argument that the "date of discovery" means the date when the amount of the loss was quantified by foreclosure or otherwise. Instead, that court held that the 90-day period commences when "the [lender] had knowledge of the specific acts [of the settlement agent] that may trigger CPL coverage and had knowledge that the collateral was insufficient to cover the amount of the loan." Order, *F.D.I.C. v. Attorneys' Title Ins. Fund, Inc.*, No. 10-21197-CIV, at 22 (S.D. Fla. May 17, 2011). In reaching this conclusion, the court provided the following reasoning why a precise quantification of the extent of the loss in not necessary to trigger the notice obligation:

> The Court finds that the plain language of the contract, common sense and analogous case law compel the conclusion that [the lender's] *knowledge of specific acts that may give rise to a covered loss together with information indicating that the loans are grossly under-securitized*, which not surprisingly led to [the lender's] charge-off of the second mortgage, *amount to discovery of loss under the CPL*. It is not necessary . . . that the actual loss be definitively quantified.
>
> The notice provision of the CPL requires that the Fund receive "notice of loss in writing . . . within ninety (90) days from the date of discovery of such loss." This provision does not state that only a quantification of the actual loss can trigger the 90-day notice period, and the Court

19

4:13-cv-00195-RBH    Date Filed 02/03/15    Entry Number 78    Page 20 of 23

> refuses to read this requirement into the contract. Moreover, the
> FDIC's contention that the language "discovery of such loss" amounts
> to computation of quantity of loss would produce unreasonable results.
> In many situations (including this case), quantification of loss under a
> CPL may not take place for years. Thus, if only a quantified actual
> loss required notice, title insurance companies like the Fund would
> remain unaware of potential claims under CPLs thereby defeating the
> purpose of timely notice. Without timely notice, title insurance
> companies cannot take steps to mitigate the loss they eventually have to
> pay.

*Id.* at 9–10; *see also* Order, *F.D.I.C. v. Attorneys' Title Ins. Fund*, No. 12-23599-CIV, 2014 WL 4384270, at \*5 (S.D. Fla. Sept. 3, 2014); *U.S. Bank Nat'l Ass'n v. First Am. Title Ins. Co.*, No. 2:10-cv-503, 2012 WL 1080876, at \*5 (March 30, 2012) (holding that bank was on notice of loss prior to foreclosure date by letter detailing a "Huge problem" with the priority of its mortgage revealed by a title search).

The Court agrees with Stewart that the evidence shows Regions had knowledge as early as August 6, 2009 that Ginn failed to secure a valid, enforceable, first priority lien on the South Carolina property, together with information indicating its loan was substantially under-securitized. Regions' account logs reflect a communication from Regions' Florida foreclosure counsel on August 6, 2009, which stated that preliminary searches on the property referenced in the South Carolina mortgage revealed that it "was never owned by SWWM, Ltd., the borrower listed on the mortgage." *See* ECF No. 49-6 at 3–4. This communication also stated that the members of SWWM "held title as individuals, not as the company" and that the property has "since been transferred to individuals and are no longer in the name of SWWM or its members." *Id.* A formal memo from the Florida foreclosure attorney to Don Wallace at Regions Mortgage followed on January 22, 2010, which stated that, from reviewing "on-line county and state records" counsel determined that "SWWM signed the

20

mortgage with Regions" on the South Carolina property but that SWWM "never actually owned" the South Carolina property. *See* ECF No. 49-14 at 2. Accordingly, the Court finds Regions had knowledge of acts that might trigger the CPL coverage as of August 6, 2009.[6] By that date, Regions had knowledge that it could not foreclose on the South Carolina mortgage because the mortgage was in SWWM's name, that title had been in the individuals' names, and that the mortgage never properly encumbered the property, as well as the fact that the property had already been sold. Moreover, Regions knew that this issue arose because of Ginn's failure to follow its closing instructions directing Ginn to secure an enforceable lien on the South Carolina property.

Regions' argument that it first needed a formal title opinion from a South Carolina lawyer before it can be considered to have knowledge of or discovered the actual loss is unavailing. Regions is correct that only a licensed South Carolina attorney is entitled to provide official opinions of title on South Carolina property. Regions, however, has provided no authority stating that discovery or knowledge of a defect in a security instrument or title under a CPL is contingent on a formal opinion of title. In any event, even if that were the case, Regions should not be rewarded for waiting seven months to obtain the formal title opinion from the South Carolina attorney. Regions should have made every effort to confirm whether or not it had a valid lien on the South Carolina property as soon as it was made aware of a likely problem by its own Florida foreclosure attorneys. Accordingly, the Court finds that Regions had the requisite knowledge and discovery of facts giving rise to a loss or claim as of August 6, 2009.

---

[6] Moreover, even if the Court found that the August 6, 2009 communication was insufficient to charge Regions with discovery of the loss, Regions undoubtedly had knowledge by January 22, 2010 when it received the formal memo.

The Court also finds that Regions knew by August 6, 2009 that the non-performing SWWM loan was under-securitized since the principle balance of the loan with accrued interest exceeded the originally appraised value of the Florida property.   As of July 10, 2009, Regions' established reserve balance was only $247,949.99 for the Florida property.  *See* ECF No. 57-1.   However, in the Fair Debt Collection Practices Act Notice dated August 21, 2009, Regions asserts that it was still owed $707,126.99 on the loan.  *See* Notice, ECF No. 50-3 at 24.   Therefore, it is clear that Regions knew the value of the Florida property was not anywhere close to the amount owed to Regions. Furthermore, Regions was not only aware that the Florida collateral was insufficient to cover the loan, it was aware that the loan was no longer secured *at all* by a portion of the collateral (*i.e.* the South Carolina property).   Accordingly, the Court also finds that Regions was aware that the loan was grossly under-securitized by August 6, 2009.

Based on the foregoing, the notice letter to Stewart Title on May 10, 2010 was sent more than nine months after the Regions' discovery of the loss.   Accordingly, this notice was untimely under the "bright line" 90-day notice requirement of the CPL.   Timely notice is a condition precedent to Stewart Title's indemnity obligation to Regions under Condition D of the CPL.   Because the undisputed record evidence shows that Regions knew more than 90 days before making its CPL claim that the South Carolina mortgage was not an enforceable, first priority lien contrary to its written closing instructions and that a loss on the loan transaction was certain to occur, Stewart Title is not liable under the CPL.   Accordingly, Stewart Title's motion for summary judgment must be granted.

CONCLUSION

The Court has thoroughly reviewed the entire record, including Plaintiff's Motion for Summary Judgment, Defendant's Motion for Summary Judgment, the responses in opposition to these motions, the replies in support of these motions, and the attached exhibits.   For the reasons stated above, the Court grants Defendant Stewart's motion, and denies Plaintiff's motion.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 49, is **GRANTED**.   **IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 50, is **DENIED**.

**IT IS SO ORDERED.**

 s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

Florence, South Carolina
February 3, 2015

23